SAN HUAN NEW MATERIALS HIGH TECH, INC., Ningbo Konit Industries, Inc., and Tridus International, Inc., Appellants,

v.

INTERNATIONAL TRADE COMMISSION,
Appellee,

and

YBM Magnex, Inc. (Successor in interest to Crucible Materials Corporation),
Intervenor.

Nos. 98-1091, 98-1159.

United States Court of Appeals,
Federal Circuit.

Nov. 20, 1998.

Rehearing Denied; Suggestion for Rehearing In Banc Declined
Jan. 28, 1999.

Gary M. Hnath, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, argued, for appellants. With him on the brief was Michael P. Leary. Of counsel was E. Brandan Magrab.

Jay H. Reiziss, Attorney, Office of the General Counsel, U.S. International Trade Commission, Washington, DC, argued, for appellee. With him on the brief were Lyn M. Schlitt, General Counsel, and James A. Toupin, Deputy General Counsel.

Darrel C. Karl, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC, argued, for intervenor. With him on the brief were Ford F. Farabow, Jr., Roger D. Taylor, Wayne W. Herrington, and Michael J. Flibbert.

Before RICH, NEWMAN, and MICHEL, Circuit Judges.

NEWMAN, Circuit Judge.

San Huan New Materials High Tech, Ningbo Konit Industries, and Tridus International appeal the decision of the United States International Trade Commission imposing civil penalties for violation of a Consent Order issued in Investigation No. 337–TA–372, conducted under Section 337 of the Tariff Act of 1930 as amended, 19 U.S.C. § 1337, relating to *Certain Neodymium–Iron–Boron Magnets, Magnet Alloys, and Articles Containing Same.*[1] We affirm the decision of the Commission.

---

1. *Certain Neodymium–Iron–Boron Magnets, Magnet Alloys, and Articles Containing Same,* USITC Pub. 3073, Inv. No. 337–TA–372 (Nov.1997) (Commission Determination on Violation of Consent Order, Apr. 8, 1997; Commission Opinion on Violation of Consent Order, Apr. 15, 1997; Commission Opinion Denying Reconsideration, Oct. 3, 1997).

## BACKGROUND

YBM Magnex, successor in interest to Crucible Materials Corporation, is the owner of United States Patent No. 4,588,439 (the '439 patent). In February 1995 YBM filed a complaint with the International Trade Commission, charging that importation by eight companies of certain neodymium-iron-boron-oxygen permanent magnets infringed the '439 patent. The Commission instituted an investigation, naming San Huan New Materials, Ningbo Konit Industries, Tridus International, and five other companies as respondents.

On October 10, 1995 San Huan, Ningbo, and Tridus entered into a Consent Order, and the investigation was terminated as to them. The Consent Order included the following provisions:

(1) The Respondents shall not sell for importation, import into the United States or sell in the United States after importation . . . neodymium-iron-boron magnets which infringe any of claims 1–3 of the '439 Patent, or articles or products which contain such magnets, except under consent or license from Crucible;

(2) The Respondents shall be precluded from seeking judicial review or otherwise challenging or contesting the validity of the Consent Order;

\* \* \*

(4) Respondents San Huan, Ningbo, and Tridus shall not seek to challenge and are precluded from any challenges to the validity or enforceability of claims 1–3 of the '439 patent in any administrative or judicial proceeding to enforce the Consent Order;

\* \* \*

(9) This investigation is hereby terminated with respect to San Huan, Ningbo and Tridus, and San Huan, Ningbo, and Tridus are hereby dismissed as named Respondents in this investigation; provided, however, that enforcement, modification, or revocation of the Consent Order shall be carried out pursuant to Subpart I of the Commission's Rules of Practice and Procedure, 19 C.F.R. Part 210.

*Certain Neodymium–Iron–Boron Magnets, Magnet Alloys, and Articles Containing Same,* Inv. No. 337–TA–372 (Int'l Trade Comm'n Oct. 11, 1995).

The investigation continued as to the five remaining respondents. The administrative law judge determined that there was violation of Section 337, *Certain Neodymium–Iron–Boron Magnets, Magnet Alloys, and Articles Containing Same,* USITC Pub. 2964, Inv. No. 337–TA–372 (May 1996) (Final Initial and Recommended Determinations, Dec. 11, 1995), finding that the '439 patent was infringed by certain of the imported magnets, either literally or under the doctrine of equivalents. The ALJ's Determinations duly became the holding of the Commission, in accordance with 19 C.F.R. § 210.42(h)(2); *see* Notice Not to Review Initial Determination, 61 Fed.Reg. 6863 (Feb. 22, 1996).

On March 4, 1996 YBM filed an enforcement complaint against San Huan, Ningbo, and Tridus, charging that they had violated the Consent Order by continuing to import and sell infringing magnets. The Commission referred the enforcement proceeding to the ALJ for a recommended determination consistent with the Commission's findings in the original investigation. The ALJ conducted a four-day evidentiary hearing, received briefs and arguments, and issued a 179–page Recommended Determination. *Certain Neodymium–Iron–Boron Magnets, Magnet Alloys, and Articles Containing Same,* Inv. No. 337–TA–372 (Int'l Trade Comm'n Jan. 17, 1997) (Recommended Determination). The ALJ held that San Huan, Ningbo, and Tridus had violated the Consent Order in bad faith by continuing unabated infringement after entering into the Consent Order. The ALJ recommended that the Commission impose an aggregate civil penalty [2] of $1,625,000, based on violations of the Consent Order on

---

**2.** It was recommended that the penalty be imposed in the aggregate because San Huan, Tridus, and Ningbo are related companies. Tridus is San Huan's exclusive representative for the sale of NdFeB permanent magnets in the United States, Tridus obtained the imported magnets from San Huan and Ningbo, and San Huan and Tridus own a controlling interest in Ningbo.

thirty-three days of the period between October 11, 1995 and October 10, 1996.

The parties filed exceptions, and the Commission adopted the ALJ's recommended determinations with three exceptions. First, the Commission ruled that *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 39 USPQ2d 1001 (Fed.Cir.1996) precluded access to the doctrine of equivalents, a ruling that was reversed in *YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317, 46 USPQ2d 1843 (Fed.Cir.1998). Second, the Commission held that the ALJ misconstrued the claim phrase "consisting essentially of in weight percent, 30 to 36 of at least one rare earth element." Because of this ruling, the Commission found no violation on one day for which the ALJ had recommended a determination of violation. Finally, the Commission determined that the date from which the San Huan respondents were required to cease importation and sales of magnets which infringed under the doctrine of equivalents was the date on which the public version of the final initial determination was issued, *i.e.*, February 5, 1996. Because of this determination, the Commission found no violation on a second day for which the ALJ had recommended a determination of violation. Thus the Commission held that San Huan, Ningbo, and Tridus had violated the consent order on thirty-one of the thirty-three days recommended by the ALJ. After further proceedings on the issue and amount of the penalty, the Commission imposed on San Huan, Ningbo, and Tridus a civil penalty of $50,000·per violation day, for a total of $1,550,000.

San Huan, Ningbo, and Tridus (hereinafter collectively San Huan) bring this appeal, arguing that the Commission has no authority to impose civil penalties. San Huan also asserts that it has a right to a trial *de novo* in district court on the issues of law and fact relating to patent infringement and whether the Consent Order was violated, and the amount of any penalty. San Huan argues, alternatively, that even if it has no right to a trial *de novo*, the Commission has no authority to impose civil penalties for violation of a consent order, as opposed to violation of a

cease and desist order. On this appeal San Huan challenges the Commission's findings of fact and conclusions of law in the original investigation. San Huan also argues that there was not substantial evidence to support the Commission's infringement determinations for certain imported magnets. San Huan argues that the amount of penalty imposed is constitutionally excessive and without reasoned basis.[3]

## DISCUSSION

### I

■ San Huan states that the Commission has no authority to impose penalties for violation of a Commission order. San Huan states that although the Commission may find a violation and suggest a penalty amount, should San Huan choose not to pay the penalty then the Commission must bring an action in district court, where San Huan is entitled to trial *de novo* on the issues of fact and law relating to both liability and the amount of the penalty. San Huan states that 19 U.S.C. § 1337(f) so provides:

**§ 337(f) Cease and desist orders; civil penalty for violation of orders.**

(1) ... the Commission may issue and cause to be served on any person violating this section, or believed to be violating this section, as the case may be, an order directing such person to cease and desist from engaging in the unfair methods or acts involved ...

(2) Any person who violates an order issued by the Commission under paragraph (1) after it has become final shall forfeit and pay to the United States a civil penalty for each day on which an importation of articles, or their sale, occurs in violation of the order of not more than the greater of $100,000 or twice the domestic value of the articles entered or sold on such day in violation of the order. *Such penalty shall accrue to the United States and may be recovered for the United States in a civil action brought by the Commission in the*

---

**3.** San Huan also argues that the Commission erred in failing to give *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 39 USPQ2d 1001 (Fed.Cir.1996), full retroactive effect in the enforcement proceeding. However, this argument has been mooted by the decision of *YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317, 46 USPQ2d 1843 (Fed.Cir.1998).

*Federal District Court for the District of Columbia or for the district in which the violation occurs.* In such actions, the United States district courts may issue mandatory injunctions incorporating the relief sought by the Commission as they deem appropriate in the enforcement of such final orders of the Commission.

(Emphasis added.)

The Commission and YBM state that the Commission plainly is authorized to assess a civil penalty, and that the action in district court is a collection action, not a trial *de novo* of the underlying case. The Commission states that the word "recover[]" in § 337(f)(2), *see supra*, means that a district court is the forum for recovery of the penalty, not determination of the amount of penalty. The Commission interprets the statute as providing a mechanism whereby the United States obtains relief in the event that enforcement must be compelled. *See, e.g.,* 15 JAMES WM. MOORE, FEDERAL PRACTICE §104.53 (3d ed.1997) ("when used in a statute the term 'recovery' has been construed as referring only to the collection of a fine or payment by the person or entity entitled to collect").

San Huan argues that 28 U.S.C. § 1355, which provides that "federal district courts generally have original jurisdiction of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture," establishes a presumption that federal district courts have unique jurisdiction to assess civil penalties. San Huan states that although the Supreme Court has held that Congress may assign to an agency the authority to adjudicate violations and assess civil penalties, Congress must clearly commit the authority to the agency. *See Atlas Roofing v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 460–61, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *see also Tull v. United States,* 481 U.S. 412, 427, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). San Huan states that § 337(f)(2) was added to § 337 in 1979, two years after *Atlas Roofing* was decided, and that Congress failed to provide statutory language assigning to the Commission the authority to assess civil penalties.

■ Section 1355 of 28 U.S.C. does not create a presumption that district courts

must uniquely determine and assess, as well as enforce, all civil penalties. *See* 13B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3578 (1984 & Supp.1998) (Section 1355 has "little if any present utility" and is "more a source of confusion that anything else"); *see also Lawrence v. Commodity Futures Trading Comm'n,* 759 F.2d 767, 771 (9th Cir.1985) ("§ 1355 gives the district courts original jurisdiction over court actions *brought to reduce fines to judgment* ") (emphasis added). The statute assigns the review of a final determination of the Commission to the Court of Appeals for the Federal Circuit. *See* § 337(c) ("Any person adversely affected by a final determination of the Commission under subsection (d), (e), (f), or (g) . . . may appeal such determination . . . to the [Federal Circuit]"). We note that § 337(c) does not distinguish between Commission determinations to issue a remedial order, § 337(f)(1), and to impose a civil penalty, § 337(f)(2). *See In re Nantucket, Inc.,* 677 F.2d 95, 98, 213 USPQ 889, 892 (CCPA 1982) ("Each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole, and it is not proper to confine interpretation to the one section to be construed.") For the reasons we shall discuss, San Huan is incorrect in its position that it is entitled to a trial *de novo,* in the district court, of the issues of fact and law relating to liability for infringement and the penalty for violation of the Consent Order.

### A

■ Determination of whether § 337(f)(2) contemplates a *de novo* trial in the district court, or merely a collection action, is a matter of statutory interpretation, a question of law to which we give plenary review. *See Nike, Inc. v. Wal–Mart Stores, Inc.,* 138 F.3d 1437, 1440, 46 USPQ2d 1001, 1003 (Fed.Cir. 1998); *Hosiden Corp. v. Advanced Display Mfrs. of America,* 85 F.3d 1561, 1567 (Fed. Cir.1996). We uphold the Commission's interpretation of § 337 if it is "reasonable in light of the language, policies and legislative history of the statute." *Enercon GmbH v. Int'l Trade Comm'n,* 151 F.3d 1376, 1381, 47 USPQ2d 1725, 1729 (Fed.Cir.1998). Accord-

ing to the parties, this is a question of first judicial impression in that the Commission's interpretation has not heretofore been challenged.

As is well established in the canons of statutory interpretation, if the statutory language is ambiguous or incomplete, or may be so perceived, it is appropriate to ascertain the legislative purpose in enacting the statute, and to implement this purpose in interpreting the statute. *See Mansell v. Mansell,* 490 U.S. 581, 592, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989); *see, e.g., Nike,* 138 F.3d at 1440, 46 USPQ2d at 1003.

Subsection 337(f)(2) was added to § 337 in 1979, as part of the Trade Agreements Act of 1979, Pub.L. No. 96–39. The Commission denies any ambiguity, and states that its interpretation of the statute since its inception has been consistent and unchallenged. The Commission states that this interpretation is entitled to deference, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and that its interpretation is unambiguously reinforced by the legislative history, citing the House and Senate reports accompanying § 337(f)(2):

> The Commission would exercise the discretionary authority provided with respect to deciding upon the appropriate size of any penalty under this section so as to insure the deterrent effect of its order while taking into account such factors as intentional versus unintentional violations and the public interest.

H.R.Rep. No. 96–317 at 191 (1979); S.Rep. No. 96–249 at 262 (1979), U.S.Code Cong. & Admin.News 1979, 381, 648. San Huan, disagreeing, argues that "Congress could well have been referring to the Commission's discretion in determining the amount it may seek in a later civil suit."

San Huan's proposed interpretation finds no support in the history of these enactments. A *de novo* determination in the district court of all legal and factual issues relating to liability and penalty would severely limit the authority of the Commission, and eviscerate the deterrent effect of a Commission order. This consequence is contrary to the congressional statements in H.R.Rep. No. 96–317 and S.Rep. No. 96–249, *supra,* that the Commission shall exercise discretionary authority "so as to insure the deterrent effect of its order."

We conclude that the statute and legislative history clearly authorize the Commission to determine liability and assess a penalty for violation of its orders, subject to appeal to the Federal Circuit; and when necessary to collect the penalty by civil action in the district court.

## B

San Huan argues that the Commission's own rules and regulations support San Huan's position that it is entitled to a trial *de novo* in the district court. We can not agree. Section 210.75 of 19 C.F.R. provides for an enforcement hearing, and court enforcement of a consent order, as follows:

**§ 210.75(b) Formal enforcement proceedings.**

\* \* \*

(3) The Commission, in the course of a formal enforcement proceeding under this section may hold a public hearing and afford the parties to the enforcement proceeding the opportunity to appear and be heard. The hearing will not be subject to sections 554, 555, 556, 557, and 702 of title 5...

(4) Upon conclusion of a formal enforcement proceeding under this section, the Commission may:

\* \* \*

> (ii) Bring civil actions in a United States district court pursuant to paragraph (c) of this section (and section 337(f)(2) of the Tariff Act of 1930) requesting the imposition of a civil penalty or the issuance of injunctions incorporating the relief sought by the Commission
>
> . . .

(c) Court enforcement.

To enforce an exclusion order, a cease and desist order, a consent order, or a sanctions order, the Commission may initiate a civil action in the U.S. district court pursuant to section 337(f)(2) of the Tariff Act of 1930, requesting the imposition of

such civil penalty or the issuance of such injunctions as the Commission deems necessary to enforce its orders and protect the public interest. The Commission may initiate a proceeding to obtain judicial enforcement without any other type of proceeding otherwise available under section 337 or this subpart or without prior notice to any person, except as required by the court in which the civil action is initiated. San Huan argues that because Rule 210.75(c) provides for initiation of judicial enforcement without prior notice and because a formal enforcement hearing does not require the due process safeguards of the Administrative Procedure Act (APA), 5 U.S.C. § 554 *et seq.*, such a lack of due process would be understandable and acceptable only if a civil action in district court would provide the due process of a *de novo* determination of all issues leading to the penalty.

The Commission replies that Rule 210.75 does not mandate in every case a full hearing only because in some circumstances a hearing may not be necessary; *e.g.,* a party may concede its violations and stipulate to the penalty. The Commission states that in every contested case it has conducted a full hearing, with notice and all appropriate procedural safeguards, as to whether the order was violated and the appropriate penalty.

San Huan does not state that it was denied notice and an opportunity to be heard before the Commission; it argues only that such is possible under the Commission regulation. We need not explore the meaning of or basis for the provisions to which San Huan objects, for it is undisputed that they were not applied in this case. No statute or rule, or due process, requires that a party who is found by proper procedures to have violated a consent order, cannot be disciplined for that violation unless the entire cause, including the matters to which the party previously consented, is litigated *de novo.*

### C

Finally, San Huan argues by analogy to practice at the Federal Trade Commission (FTC) under a statute that San Huan says contains language "almost identical" to that in § 337(f)(2). The statute provides that civil penalties for violation of an FTC order "shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States." 15 U.S.C. § 45(*l*). In such an action by the Attorney General the district court conducts a trial *de novo* of the subject matter that led to the FTC cease and desist order, makes independent findings of violation, and sets the amount of any civil penalty. *See, e.g., United States v. Danube Carpet Mills, Inc.,* 737 F.2d 988 (11th Cir.1984). San Huan argues that because Congress used similar language in § 337(f)(2), the same procedure is required for Commission actions.

San Huan's analogy to this aspect of FTC practice is not apt. The FTC statute on which San Huan relies, 15 U.S.C. § 45(*l*), requires filing of an action in district court by the Attorney General, not the agency. Such a procedure is not available for Commission actions; this section of the FTC statute has no counterpart in 19 U.S.C. § 1337. An alternative FTC enforcement provision, 15 U.S.C. § 45(m), is more closely analogous to § 337(f)(2), but is also explicitly divergent in the authority assigned to the district court. Subsection (m) authorizes the FTC to bring a civil action in district court to recover a civil penalty; *see* § 45(m)(1)(A) ("The [FTC] may commence a civil action to recover a civil penalty in a district court . . . [for knowing violations of rules and cease and desist orders]"). This subsection also provides that the district court shall "determin[e] the amount of such a civil penalty," setting criteria including "the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." In contrast, § 337(f)(2) does not place review or relitigation authority in the district court, and judicial review of the merits of the agency action is placed in this court, directly from the agency. The legislative history of § 337(f)(2) explains the purpose of the penalty authority assigned to the Commission:

> The Commission would exercise the discretionary authority provided with respect to deciding upon the appropriate size of any penalty under this section so as to insure the deterrent effect of its order while taking into account such factors as intentional

versus unintentional violations and the public interest.

H.R.Rep. No. 96–317 at 191, S.Rep. No. 96–249 at 262, U.S. Code Cong. & Admin.News 1979, at 648.

Thus it is apparent that the FTC and the Commission operate under different statutory regimes of enforcement authority, in harmony with their different purposes and scope. The procedures of each agency are independent, and do not control the actions of the other.

**D**

We conclude that an action brought in the district court under 19 C.F.R. § 210.75(c), implementing 19 U.S.C. § 1337(f)(2), is not a trial *de novo* but simply a collection proceeding. The statute and rules neither require nor permit retrial in the collection proceeding of issues of fact and law relating to liability and amount of penalty.

**II**

■ San Huan argues that even if the Commission may assess and impose civil penalties, it may not do so for violation of consent orders. San Huan argues that the provision for civil penalties in § 337(f) applies only to cease and desist orders and not to consent orders:

§ 337(f) **Cease and desist orders; civil penalty for violation of orders**

(1) ... the Commission may issue and cause to be served on any person violating this section, or believed to be violating this section, as the case may be, an order directing such person to cease and desist from engaging in the unfair methods or acts involved ...

(2) Any person who violates an order issued by the Commission under paragraph (1) after it has become final shall forfeit and pay to the United States a civil penalty ...

San Huan states that consent orders are governed by an "entirely separate scheme" whereby a consent order may result in the termination of an investigation, and that there can be no penalty for a violation unless a cease and desist order is issued upon violation of the consent order:

§ 337(c) **Determinations; review**

The Commission shall determine, with respect to each investigation conducted by it under this section, whether or not there is a violation of this section, except that the Commission may, by issuing a *consent order* ... terminate any such investigation, in whole or in part, without making such a determination.

(Emphasis added.) San Huan asserts that the Commission practice of imposing a civil penalty for violation of a consent order is improper, and must be curtailed. San Huan states that the civil penalty is inherently penal rather than remedial and that application of the doctrine of strict construction of penal statutes requires that § 337(f)(1) and (2) must be construed strictly; that is, limited to cease and desist orders as in the statute, unaffected by regulations of broader scope. *See Commissioner v. Acker*, 361 U.S. 87, 91, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959) ("penal statutes are to be construed strictly").

**A**

When San Huan raised this argument in the enforcement proceeding, the Commission pointed to the enactment in 1988 of the Omnibus Trade and Competitiveness Act of 1988 (OTCA), Pub.L. No. 100–418 (1988) (amending 19 U.S.C. § 1337), providing an express statutory basis in § 337(c) for the long-standing Commission practice of issuance and enforcement of consent orders. The Commission rules in effect before, during, and after enactment of the OTCA provided that consent orders could be enforced by civil penalties.

In 1981, the Commission amended its rules to allow termination of § 337 investigations by consent order:

§ 211.22(b) ... The consent order shall have the same force and effect and may be enforced, modified, or revoked in the same manner as is provided in section 337 and Parts 210 and 211 for other Commission action.

\* \* \*

§ 211.56(b) ... To enforce a Commission order, the Commission may ... initiate a

civil action in the U.S. district court pursuant to section 337(f). . . .

19 C.F.R. §§ 211.22(b), 211.56(b) (1981). In publishing these final rules in 1981, the Commission had explained:

[T]he Commission's decision to use the same procedure for consent orders and cease and desist orders is based on several considerations. The first is the similarity of consent orders and cease and desist orders. A consent order is predicated on the parties' consent to the imposition of a cease and desist order. Additionally, both cease and desist orders and consent orders are final orders of the Commission which have a res judicata effect.

46 Fed.Reg. 17526 (Mar. 18, 1981) (final rules). These rules remained in force at the time of enactment of the OTCA; *see* 19 C.F.R. §§ 211.22(b), 211.56(b) (1988). The current rules are similar. *See* 19 C.F.R. § 210.21(c)(3)(ii) ("The consent order shall have the same force and effect and may be enforced, modified, or revoked in the same manner as is provided in [§337] and this part for other Commission actions"), § 210.75 ("To enforce an exclusion order, a cease and desist order, a consent order, or a sanctions order, the Commission may initiate a civil action in the U.S. district court pursuant to section 337(f)(2)").

Moreover, legislative history shows that Congress was aware of the Commission's rules and practices during enactment of the OTCA. A Senate Report cites the Commission's practices:

[The proposed legislation] amends section 337(b)(1) to authorize the Commission to terminate investigations, in whole or in part, by issuing consent orders or on the basis of settlement agreements. The Commission has for a number of years terminated section 337 investigations in these ways without making a determination regarding whether the statute has been violated, under authority derived from the [APA]. The amendment provides express authority for such terminations. It is intended to put to rest any doubts regarding the Commission's authority to terminate investigations by issuance of consent orders or on the basis of settlement agreements without making a determination regarding violation of the statute.

S.Rep. No. 100–71 at 130 (1987). *See also* H.R.Rep. No. 100–576 at 634 (1988), U.S.Code Cong. & Admin.News 1988, 1547, 1667 ("The House bill makes explicit the Commission's authority to terminate investigations in whole or part on the basis of a consent order"). Thus, there is no basis for inferring that Congress, in codifying the practice of entering into consent orders, intended to eliminate the Commission's practice of treating consent orders and cease and desist orders the same way in enforcement proceedings.

The legislative history leaves no doubt that Congress was aware of, and approved of, the Commission's consent order procedure as it existed at the time of the 1988 amendments. Responding to San Huan's challenge to the Commission's authority, the Commission referred to its long-standing practice of imposing civil penalties for violations of consent orders, and to Congressional ratification of that practice. Indeed, since at least 1981 the Commission's rules have provided that Commission consent orders may be enforced by civil penalty proceedings. The legislative history shows that Congress was fully aware of the agency regulations and practices at the time of legislating in their area, and absent some special circumstance the failure to change or refer to existing practices is reasonably viewed as ratification thereof. *See Young v. Community Nutrition Institute,* 476 U.S. 974, 983, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) ("congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress"); *see also In re Donaldson Co.,* 16 F.3d 1189, 1193 n. 3, 29 USPQ2d 1845, 1848 n. 3 (1994) (*in banc*) (reenactment of statute, unaccompanied by Congressional awareness of current agency practice, did not indicate Congressional approval); *see generally* 2A C. DALLAS SANDS, SUTHERLAND ON STATUTORY CONSTRUCTION § 49.09 (4th ed.1984) (rule of implied adoption of agency interpretation).

**B**

The Commission also observed that San Huan had unilaterally proposed and voluntarily entered into the Consent Order that

**1356**

incorporated the Commission's § 337(f)(2) civil penalty authority. San Huan had moved for termination of the original investigation under 19 C.F.R. § 210.21, which provides in part that:

> The consent order shall have the same force and effect and may be enforced, modified, or revoked in the same manner as ... other Commission actions.

Paragraph 4 of the Consent Order provides that "enforcement, modification, or revocation of the consent order shall be carried out pursuant to Subpart I of the Commission's Rules of Practice and Procedure, 19 C.F.R. Part 210." Part 210 includes Rule 210.75(b) and (c), which implement the Commission's authority under § 337(f)(2) to enforce consent orders through imposition of civil penalties. Thus, the Commission found that San Huan knew that the Commission would apply its § 337(f)(2) enforcement authority, including the authority to impose civil penalties, when in entered into the Consent Order.

San Huan acknowledges that it moved for termination of the investigation by consent order under Rule 210.21, but states that the language of Rule 210.21 was not incorporated in the Consent Order, despite the reference to Part 210. San Huan argues that § 337(f)(2) does not expressly provide for the imposition of civil penalties for the violation of Commission consent orders, and that there is nothing in Rule 210.21, and nothing in ¶ 4 of the Consent Order, that required it to agree to remedies not authorized by statute.

The Commission replies that a consent order is a contract, *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), and that San Huan's stipulation to ¶ 4 of the Consent Order rounded out the statute and regulatory enactments. It is the consent of the parties that is being enforced, and San Huan plainly consented to the terms of the Order. *See Firefighters v. Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) ("the parties consent animates the legal force of a consent decree" and court may enter a consent decree that provides greater relief than might otherwise be available).

San Huan states that the proper course of action for the Commission, upon violation of a consent order, is replacement of the consent order with either a cease and desist order or an exclusion order. San Huan argues that the holding of *Farrel Corp. v. Int'l Trade Comm'n*, 949 F.2d 1147 (Fed.Cir.1991) (Commission can not halt investigation to defer to arbitration agreement), supports its position that consent orders are only "narrow, informal expedients," unenforceable unless superseded by a cease and desist order.

The Commission responds that San Huan, by seeking and entering into the Consent Order that terminated the investigation, escaped the possibility of an exclusion order. The Commission observed that by the consent order San Huan agreed not to import or sell magnets that infringe certain claims of the '439 patent, and that this undertaking was identical to the acts prohibited by a cease and desist order that had been issued to another company at the conclusion of the investigation. According to the Commission, the only pertinent difference between the Consent Order and the cease and desist order was that San Huan avoided the investigation and therefore the Commission made no determination of violation in the original investigation.

The Commission points out that if upon violation of a consent order the Commission could only revoke that order and impose a cease and desist order, parties who anticipated an adverse ruling in the investigation could simply enter into a consent order with no intent of complying with the order, knowing that the only consequence of failing to comply would be the imposition of an exclusion order later than otherwise would have been the case.

**C**

San Huan's interpretation of the statute and regulations would render consent orders meaningless. A procedure that inhibits voluntary settlement by consent is not favored, as a matter of policy as well as fairness to all those involved in the controversy. A consent order whereby the Commission terminates its investigation upon agreement of the respondent to cease its infringing activities invokes the restraint of federal power, upon the respondent's undertaking to comply with

the law; thus its violation is subject to federal remedy, by penalty and enforcement in accordance with statute and regulation. The consent order is far from an informal expedient; incidentally, we note that *Farrel* was overruled by statute in 1994. The Commission's long-standing interpretation of § 337(f)(2) has been that consent orders may be enforced through civil penalties; this interpretation is correct; and even if there were ambiguity, the Commission's interpretation is reasonable and warrants appropriate deference. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1573 (Fed.Cir.1994) ("In a situation where Congress has not provided clear guidance on an issue, *Chevron* requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable.")

### D

We affirm the Commission's ruling that a consent order is enforceable by civil penalty, imposed by the Commission and recoverable in the district court in the event of nonpayment.

### III

■ At the hearing in the enforcement proceeding, San Huan sought to introduce prior art for the purpose of limiting the available range of equivalents. The ALJ excluded this evidence as inconsistent with the Commission's findings in the original investigation, and as an indirect attack on patent validity, prohibited by the Consent Order. San Huan also challenged the application of measurement error to the scope of the claims.

Claim 1 of the '439 patent, the independent claim at issue, reads:

1. A permanent magnet alloy consisting essentially of, in weight percent, 30 to 36 of at least one rare earth element, 60 to 66 iron, 6,000 to 35,000 ppm oxygen and balance boron.

In the original investigation, the ALJ and the Commission determined that one of ordinary skill in the art at the time the '439 patent application was filed would have understood that the numerical values in the claim were subject to measurement error of ±150 ppm. Accordingly, the Commission determined that magnets having oxygen contents measured between 5,850 ppm and 6,000 ppm literally infringed. The Commission also determined that all "rare earth element-iron-boron magnets alloys having 5,500 ppm oxygen perform interchangeably, with respect to stability, with rare earth element-iron-boron magnet alloys having from 6,000 to 35,000 ppm oxygen." The Commission then determined that magnets having oxygen contents measured between 5,450 ppm and 5,850 ppm infringed the '439 patent under the doctrine of equivalents.

San Huan now asserts that the Commission, in determining that magnets with oxygen contents measured between 5,450 ppm and 6,000 ppm infringed the '439 patent, erred with respect to issues of measurement error and prior art limitations on the doctrine of equivalents. In particular, San Huan argues that the probability that a reading between 5,850 ppm and 6,000 ppm, would have an actual oxygen value less than 6,000 ppm would always be greater than 50%, while YBM was required to prove infringement by a preponderance of the evidence.

The Commission rejected San Huan's challenge as inconsistent with the Commission's determinations in the original investigation, and as barred by consent. On appeal, San Huan states that it was a violation of fundamental due process rights for the Commission, in the enforcement proceeding, to deny San Huan the opportunity to litigate infringement by equivalents. The Commission replies that by entering into the Consent Order, San Huan waived its right to litigate these issues. *See United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) (by entering consent decree, "[t]he parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation"); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment e (1980) (general rule that issue preclusion does not apply to issues not actually litigated "does not apply with respect to any issue in a subsequent action" when a party enters into a consent judgment).

The Commission observes that San Huan, in the original investigation, participated in

discovery and submitted its motion and proposed consent order fifteen days after the ALJ had denied its motion for summary judgment of patent invalidity and non-infringement (literally and under the doctrine of equivalents). The second paragraph of the Consent Order states that San Huan "shall be precluded from ... challenging or otherwise contesting the validity of the consent order." San Huan did not reserve in the Consent Order the right to relitigate the determinations it now challenges. Absent an explicit reservation, the order itself precludes the challenge now made. *See Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1576, 10 USPQ2d 1296, 1299 (Fed.Cir.1989). Having voluntarily entered into this agreement, due process is not violated by holding San Huan to its bargain.

We agree with the Commission that San Huan was given a full and fair opportunity to litigate in the original investigation such issues as measurement error and prior art limitations on the doctrine of equivalents. *See Armour*, 402 U.S. at 681, 91 S.Ct. 1752. By entering into the Consent Order, San Huan waived its rights to challenge determinations reached in the original investigation, for which litigation was continuing as to the other respondents. The Consent Order, submitted after denial of San Huan's motion for summary determination of non-infringement under the doctrine of equivalents, and explicitly stating that San Huan would not sell or import magnets "which infringe any of claims 1–3 of the '439 patent" was fair notice to San Huan that it would have no right to relitigate the range of equivalents. *Cf. Certain Erasable Programmable Read Only Memories,* Inv. No. 337–TA–276, Recommended Determination at 38 (June 22, 1990) (applying claim construction adopted in original Commission decision on violation in enforcement proceeding). The time for San Huan to challenge the determinations as to measurement error and prior art limitations on the scope of equivalents was in the original investigation. There is no denial of due process in applying to San Huan the claim construction that it declined to challenge by offering consent and seeking termination of the investigation.

## IV

▪ In addition to challenging the ruling of the Commission in the original proceeding, San Huan argues that the Commission erred in the enforcement proceeding. By stipulation, all of the magnets offered into evidence at the enforcement proceeding were grouped for testing by size and grade. Moreover, magnets of various sizes and grades were imported or sold on various potential violation days; the ALJ found forty-three size/grade/date combinations. In the enforcement proceeding complainant YBM provided tests of the chemical composition of various magnets imported by San Huan. San Huan states that the Commission should have accepted the tests conducted on behalf of San Huan by Durkee Testing Laboratories, instead of the tests conducted by YBM; that there was not substantial evidence of infringement where magnets were too thin to test; and that there was not substantial evidence of the chemical content of certain magnets.

### A

San Huan states that it had its magnets tested by an independent testing laboratory, Durkee, and that for all but a few of the magnets at issue, Durkee's results were consistently below 6,000 ppm and in most cases below 5,450 ppm oxygen, the level below which the Commission found no infringement. San Huan argues that civil penalties can not be levied when there is a conflict in test results, for the law must make "unmistakably clear" the acts that are prohibited, citing *Snitkin v. United States,* 265 F. 489, 494 (7th Cir.1920).

The Commission states that San Huan agreed to stop importing and selling magnets that infringed the '439 patent, and that San Huan did not rely on Durkee's test results in deciding to import its magnets, since San Huan contracted with Durkee to test those magnets for which YBM's tests showed infringement only after the Commission instituted the enforcement proceeding. The Commission observes that the YBM test procedures used in the enforcement proceeding were the same as those used in the original investigation, where they were not chal-

lenged by San Huan. The Commission states that the machine for oxygen analysis used by YBM is at least as accurate as the machine used by Durkee. The Commission states that it closely examined the competing testing protocols offered by the parties, and that the Commission reasonably chose to rely on YBM's test results rather than Durkee's.

The ALJ cited several factors that called into question the reliability of Durkee's test results. For example, the ALJ found that Durkee used samples that were significantly larger than recommended by Durkee's own standard testing protocol, and that these samples emitted carbon dioxide, saturating the infrared cell of the machine used to detect oxygen and resulting in artificially low oxygen content readings. The ALJ also found that Durkee retested magnets that it believed had tested "too high" for oxygen on the initial tests. San Huan does not refute that the oxygen analyzer used by YBM is as accurate as that used by Durkee.

On review, we conclude that substantial evidence supports the Commission's choice to rely on YBM's test results rather than Durkee's. *See* 5 U.S.C. § 706(2)(E); *Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1019, 4 USPQ2d 1283, 1284–1285 (Fed.Cir.1987).

**B**

San Huan states that because of the difficulties associated with testing certain "thin" magnets (magnets thinner than 0.2 inches), there was not substantial evidence to support findings of infringement as to these magnets. San Huan argues that the method of preparing these magnets for testing leads to surface contamination, resulting in "false high" results. San Huan cites testimony of YBM's expert that preparing and testing thin magnets is more difficult than preparing and testing larger magnets.

The Commission replies that although there was testimony that preparing and testing thin magnets is more difficult than preparing and testing larger magnets, no witness testified that thin magnets could not be accurately tested. The Commission states that of the 92 magnet types that YBM tested for the enforcement proceeding, 36 types were thin magnets. For these thin magnets, the oxygen contents ranged from 2,000 ppm to 15,000 ppm. More than half of the tested samples of thin magnets showed oxygen contents below 6,000 ppm. The Commission states that these results belie San Huan's contention that thin magnets produce "false high" oxygen levels. The Commission notes that Durkee also conducted tests on magnets thinner than 0.2 inches, and presumes that Durkee did not believe that such magnets either could not be tested or would yield artificially high oxygen content results.

The record shows that thin magnets require more preparation for testing, but that such preparation need not result in greater contamination. San Huan has not directed us to any evidence of surface contamination on thin magnets. We affirm that there is substantial evidence to support the findings of infringement for the thin magnets that were found to be in the infringing ranges of chemical composition.

**C**

San Huan states that there was not substantial evidence of infringement for four categories of magnets: (1) the T25 magnets; (2) the T95 magnets; (3) the E63B, NE1C, E152F, and T41 magnets; and (4) the E77C and H8 magnets. According to San Huan, the Commission erred in finding a violation for the specified days on which these magnets were sold.[4]

**1. T25 Magnets**

San Huan asserts that YBM conducted no complete chemical analysis for the T25 magnets. Several T25 magnets were found to have levels of oxygen within the literal range of the '439 patent claims, but there was no analysis of iron, total rare earth (TRE), or boron levels. Complete chemical analyses were performed on other magnets that were of the same size and grade but were imported or sold on another day than the T25 magnets. These analyses showed iron, TRE, boron, and oxygen levels within the claimed ranges.

**4.** Designated confidential information relevant to these activities has not been included.

San Huan argues that the Commission improperly assumed that the T25 magnets would have the same chemical composition as magnets of the same size and grade as the T25 magnets. According to San Huan, there is no basis in the record for assuming that magnets from different batches will have the same chemical composition.

The Commission found that evidence that several magnets of the same size and grade were tested and found to infringe on another violation day constitutes sufficient evidence that the untested T25 magnets violated the Consent Order on the day on which they were sold or imported. *See Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272, 229 USPQ 805, 813 (Fed.Cir.1986) (infringement may be proven by direct or circumstantial evidence). The Commission and YBM argue that although the Commission found that oxygen levels could vary between magnets of the same size and grade, the Commission made no such finding with respect to any other element. The Commission points out that the magnets of the same size and grade as the T25 magnets showed levels of TRE and iron well within the claimed range, and that there is no reason to believe that one sample would be outside the claimed ranges for TRE and iron if the tested samples were comfortably within the claimed ranges.

We affirm the Commission's reasoning, as reasonable and supported by substantial evidence. The complete chemical analyses of magnets of the same size and grade as the T25 magnets constitute sufficient evidence of infringement by the T25 magnets on the violation day at issue. There is no evidence shown to contradict YBM's evidence relating to the TRE and iron contents of the T25 magnets, for San Huan did not present any chemical analyses for elements other than oxygen for any magnet type, including the T25.

## 2. T95 Magnets

San Huan asserts that of the T95 magnets, YBM conducted a complete chemical analysis only of T95# 1, and that no iron was reported for this magnet.

The Commission replies that all claimed elements were measured with the exception of iron, because the remaining sample was too small to obtain an iron reading. The ALJ found that insofar as the measured elements amounted to approximately 39 weight percent, one could infer that the iron content balance was approximately 61 weight percent.

San Huan replies that there was no basis in the record in the form of expert testimony or otherwise, to support the ALJ's factual inferences. San Huan states that "there may have been other elements present in the magnet which were not reported, or because of rounding errors in some of the other measurements, the iron content would be less than 60% and therefore outside of [YBM's] patent."

We note that the violation day at issue is the same for the T25 and the T95 magnets. YBM points out that the sanction assessed for this violation day is supported if the record contains substantial evidence that either T25 or T95 magnets infringed the '439 patent. We agree, and therefore we affirm the determination of violation for the day at issue.

## 3. E63B, NE1C, E152F, and T41 Magnets

San Huan argues that with respect to this group of magnets, YBM conducted a complete chemical analysis only of a single magnet in each group, and that an average of measured oxygen contents for that magnet in each group was below 5,450 ppm according to YBM's tests.

### a. E63B

San Huan states that in the E63B group, YBM conducted a complete chemical analysis only of the second magnet, *i.e.,* magnet E63B# 2. The oxygen content for this magnet, according to YBM's test results, was 5,100 ppm (the average of 4,800 and 5,400 ppm).

The Commission replies that although E63B# 2 was the only magnet of its grade, size, and type for which a complete chemical analysis was performed, average oxygen measurements were taken for two other magnets, these being of the same type, size, grade as E63B# 2, and from the same shipment as E63B# 2. Indeed, magnets

E63B# 1 and E63B# 3 produced average oxygen readings of 5,850 and 5,900 ppm respectively.

We conclude that there is substantial evidence of infringement by the E63B magnets. The E63B# 2 magnet was shown to contain iron, TRE, and boron within the claimed levels. The average oxygen reading for E63B# 2 was not within the claimed range, but the average oxygen readings for two magnets of the same size, grade, and type, and from the same shipment were within the claimed range. The iron, TRE, and boron levels of E63B# 2 provide substantial evidence of the iron, TRE, and boron levels of the E63B# 1 and E63B# 3 magnets, for no sound reason was proffered as to why they should differ. Therefore, we affirm the finding of infringement by the E63B group of magnets.

### b. NE1C

San Huan states that in the NE1C group, YBM conducted a complete chemical analysis only of magnet NE1C# 3. The oxygen content for this magnet, according to YBM's test results, was 4,900 ppm (the average of 4,800 and 5,000 ppm).

The Commission argues that despite the result for magnet NE1C# 3, the oxygen reading for NE1C# 4, a magnet which was not completely analyzed chemically, was 5,650 ppm. The Commission adds that complete chemical analyses were performed on magnets of the same size and grade as the NE1C# 3 magnet, in which all elements were present in the literal scope of the claim.

This situation is analogous to that of the E63B magnets. The iron/TRE/boron readings for NE1C# 3 constitute substantial circumstantial evidence of iron/TRE/boron content for NE1C# 4, whose oxygen level was found to be within the claimed limits. Therefore, substantial evidence supports the finding of infringement by the NE1C group of magnets.

### c. E152F

San Huan states that in the E152F group, YBM conducted a complete chemical analysis only of magnet E152F# 1. The oxygen content for this magnet, according to YBM's test results was 5,275 ppm (the average of 4,500;

5,700; 5,500; and 5,400 ppm). We need not address San Huan's argument, for on the day at issue there was a violation with respect to another type of magnet on which a complete chemical analysis was performed. Thus there is substantial evidence of a violation on the day at issue.

### d. T41

There are nine magnets of this size and grade. All were imported or sold on the same day, *i.e.*, the violation day at issue. The average oxygen readings for T41# 1 and T41# 5 are within the claimed range, *viz.*, 5,700 ppm and 6,100 ppm respectively. YBM conducted a complete chemical analysis only of magnet T41# 7, for which the average oxygen content, according to YBM's test results, was 5,275 ppm (the average of 4,500; 5,700; 5,500; and 5,400 ppm). However, the iron/boron/rare earth readings for T41# 7 are within the claimed range, and constitute substantial evidence of iron/TRE/boron content for T41# 1 and T41# 5, whose oxygen levels are within the claimed limits. Thus there is substantial evidence of infringement by the T41 group of magnets.

### 4. E77C and H8 Magnets

With respect to the E77C and H8 magnets, San Huan states that YBM conducted a complete chemical analysis only for magnet E77C# 2, having TRE content of 36.31%; and magnet H8# 9, having TRE content of 36.45%. The claim states a range of 30 to 36 weight percent TRE. San Huan argues that "'rounding' cannot be used to expand the scope of the claims." The Commission and YBM respond that the claims do not require accuracy to even one decimal place, and that the Commission consistently rounded weight percentages for TRE and iron to the nearest integer. YBM states that the undisputed instrument error for neodymium detection was .4 weight percent.

It was not shown to be error, legal or scientific, for the Commission to recognize these limits of accuracy, and to round the measured weight percentages to the nearest integer. There is substantial evidence of infringement by the E77C and H8 magnets on the violation days at issue.

**D**

The Commission's determination of violations of the Consent Order by certain importations on the designated days is supported by substantial evidence of record, and must be affirmed. *See* 5 U.S.C. § 706(2)(E); *Tandon Corp.*, 831 F.2d at 1019, 4 USPQ2d at 1284–1285.

**V**

The Commission determined that San Huan violated the Consent Order in bad faith, considered other relevant factors, and set the penalty at half the statutory daily maximum. San Huan asserts that the penalty is constitutionally excessive and without reasoned basis.

**A**

In determining the amount of penalty, the Commission took into account the "three overarching considerations enumerated by Congress in the legislative history [of section 337(f)(2) ], viz., the desire to deter violations, the intentional or unintentional nature of any violations, and the public interest." The Commission applied the six-factor analysis that it had utilized in prior enforcement proceedings. *See Certain Erasable Programmable Read Only Memories*, Commission Opinion (July 19, 1991) [hereinafter *EP-ROMs* ]. This analysis balances (1) the good or bad faith of the respondent, (2) the injury to the public, (3) the respondent's ability to pay, (4) the extent to which the respondent has benefited from its violations, (5) the need to vindicate the authority of the Commission, and (6) the public interest.

First, the Commission found that San Huan made "some efforts" to comply with the Consent Order, but that the bulk of San Huan's compliance efforts occurred only after the Commission initiated the enforcement proceeding. The Commission observed: "The degree to which a respondent takes steps on its own initiative to assure compliance affects the judgment as to what penalty is necessary to induce a sufficiently vigilant posture. Accordingly, [San Huan's] bad faith in complying with the consent order militates in favor of a substantial penalty."

The Commission determined that the harm to the domestic industry, based on San Huan's infringing sales, supported the penalty recommended by the ALJ. On the aspect of ability to pay, the Commission determined that San Huan New Materials High Tech owned an interest in several major facilities in China that produced infringing magnets, including Ningbo Konit Industries. The Commission found that San Huan New Materials High Tech was associated with the Chinese Academy of Sciences and the Chinese Government, and concluded that San Huan had the ability to pay the ALJ's recommended penalty.

■ The Commission devoted much attention to factor (4), *i.e.*, the extent to which San Huan benefited from its violations, "with a view to determining the general order of magnitude of the infringing conduct." San Huan argued before the Commission that the appropriate measure of the benefit was the *import* value of the products that San Huan admitted were sold in violation of the Consent Order. The Commission, however, determined that this import value "greatly understate[d] the extent of [San Huan's] sales in violation of the consent order," and that the *sales* value of the imported goods better reflected the effect of the infringing sales on the U.S. market. The Commission calculated the sales values of magnets for each size/type where at least one magnet of such size/type was found to have infringed, but refused to assume that if one magnet of a particular size and grade infringed, then all other magnets of the same size and grade infringed. The Commission then determined, based on a summary of YBM's evidence prepared by San Huan, that of the number of magnets tested by YBM, a certain percentage were infringing. The Commission used this percentage to approximate the sales value of magnets that actually infringed. The Commission explained, on reconsideration:

We think it is reasonable to use this percentage to estimate the total value of magnets sold by [San Huan] in violation of the consent order. In this regard, we think that [YBM] made a good faith effort to prove the extent of [San Huan's] violation of the consent order. [YBM] was not required, in our view, to test every magnet sold by respondents. Given the abbreviat-

ed discovery period and the fact that [San Huan] often shipped their magnets to customers without maintaining samples for testing, [YBM] could not be expected to have test data on a magnet from each lot shipped to the United States or sold to a U.S. customer since October 10, 1995, when the consent order became effective. Nevertheless, the record demonstrates that [YBM] tested a substantial and clearly representative share of [San Huan's] magnets.

Commission Opinion Denying Reconsideration at 31–32. We agree that this approach was reasonable, and must be sustained.

With respect to the factor of the Commission's authority, the Commission determined that a "significant penalty" was necessary in light of San Huan's actions in this proceeding, first unilaterally proposing to enter into the Consent Order, obtaining a termination of the investigation without the issuance of further orders, and continuing the importation substantially unabated. The Commission stated: "[San Huan] here actively induced the Commission to permit them to avoid significant further litigation costs and to import free of interference from the Customs Service. Thus, while the Commission generally has an interest in vindicating its authority where one of its orders is violated, that interest is particularly strong in the circumstances of this case." Finally, addressing the "public interest" factor, the Commission determined that the public interest favors the protection of intellectual property rights and weighs in favor of a "significant penalty."

The Commission concluded: "Based on a balancing of the foregoing factors, particularly the fact that [San Huan] made some, albeit belated, efforts to comply with the Commission's order, we have concluded that the maximum daily penalty of $100,000 is not warranted in this case. However, we believe that all of the factors discussed above support the recommended penalty of $50,000 per violation day."

**B**

During the enforcement proceeding San Huan argued that the proposed penalty is constitutionally excessive. San Huan argued that the penalty was set not solely for reme-

dial purposes but for retribution, is not commensurate with the nature and extent of the violation, and therefore is prohibited by the Excessive Fines Clause of the Eighth Amendment. *See* U.S. Const. amend. VIII; *United States v. Bajakajian,* ——— U.S. ———, ———, 118 S.Ct. 2028, 2036, 141 L.Ed.2d 314 (1998) ("touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of forfeiture must bear some relationship to the gravity of the offense").

San Huan also argues that the penalty imposed is a "grossly excessive" fine prohibited by the Due Process Clause. *See* U.S. Const. amend. V; *see, e.g., BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (two million dollar punitive damages award was grossly excessive when compensatory damages amounted to only $4,000); *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (upholding penalty of no more than 10 times the amount of harm resulting from the defendant's conduct); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (punitive damage award of "more than 4 times the amount of compensatory damages" is "close to the line"). Thus San Huan argues that the ratio of penalty to value of infringing goods is unacceptably large, because the value of infringing goods is less than that determined by the Commission. *See BMW,* 517 U.S. at 580, 116 S.Ct. 1589 ("most commonly cited indicium of an unreasonable or excessive punitive damage award is its ratio to the actual harm inflicted on the plaintiff").

The Commission reasoned that even if the Excessive Fines and Due Process Clauses applied, San Huan's constitutional challenges have no merit. The Commission relied on its computations of value of infringing imports and percentage of infringing products, and found that the assessed penalty of $1.55 million ($50,000 per violation day times 31 violation days) was about three times that value, and well within constitutional limits. *See BMW,* 517 U.S. at 581, 116 S.Ct. 1589 (suggesting ratio of "not more than 10 to 1" is permissible under Due Process Clause); *see*

*also Bajakajian,* —— U.S. at ——.– ——, 118 S.Ct. at 2036–38 (fine is unconstitutional if "grossly disproportional" to gravity of . offense).

## C

■ On appeal, San Huan again argues that the ratio of penalty to value of goods imported in violation of the Consent Order is unacceptably large, because the value of infringing imports is less than that determined by the Commission. San Huan argues that the Commission's adding together of the sales values of magnets for each size/type where at least one magnet of such size/type was found to have infringed, is contrary to the Commission's explicit refusal to assume that magnets of the same size and grade but from different shipments would have similar oxygen contents. Similarly, San Huan argues that there is no support for the Commission's determination of the percentage of infringing magnets. The Commission took the total number of magnets with oxygen readings above 5,450 ppm according to YBM's tests and divided this number by the total number of magnets tested by YBM. San Huan argues that because in many cases YBM tested fewer magnets if that type had been found to have low oxygen readings and more magnets if that type had been found to have higher oxygen readings, the Commission's analysis is "heavily biased toward magnet types that YBM found to have higher oxygen readings, and bears no relationship to actual sales of allegedly infringing magnets."

The Commission and YBM argue that the record shows ample support for the Commission's values and calculations. The Commission attributes any inconsistency and inaccuracy to San Huan, because for certain infringing magnets, San Huan provided no records whatsoever of their composition. The Commission states that YBM was not required to test every magnet, and that it would have been impossible for YBM to have done so, since San Huan often shipped magnets directly to customers in the United States without maintaining any samples for testing, despite the existence of the Consent Order.

San Huan has not shown that the Commission's estimates and procedures are unreasonable. Substantial evidence supports the Commission's determinations of the value of the infringing magnets that were sold in violation of the Consent Order. Considering all of the circumstances, any inaccuracy in the Commission's computations was at least partly attributable to San Huan. *See Sensonics, Inc. v. Aerosonic Corp.,* 81 F.3d 1566, 1573, 38 USPQ2d 1551, 1556 (Fed.Cir.1996) ("When calculation of damages is impeded by incomplete records of the infringer, adverse inferences are appropriately drawn.") The penalty of about three times the value is well within constitutional limits. *See BMW,* 517 U.S. at 581, 116 S.Ct. 1589 ("not more than 10 to 1"); *see also Bajakajian,* —— U.S. at ——, 118 S.Ct. at 2038 ("grossly disproportional" fine is unconstitutional).

San Huan's other arguments are inapt, for San Huan points to small shipments, ignoring large ones. We agree with the Commission that San Huan's presentation of the evidence is overly selective. In light of the circumstances highlighted by the Commission in its determination of bad faith and its analysis of the extent to which San Huan benefited from its violations, the Commission's selection of a penalty of $50,000 per violation day over 31 violation days is not excessive, and represents a relatively low ratio of penalty to value of infringing goods. The Commission's assessment of a penalty of half the statutory limit per violation day, is supported by the record, represents no abuse of discretion, and encounters no constitutional barrier.

## D

■ San Huan argues that the penalty imposed by the Commission is without reasoned basis. The Commission responds by pointing to the thorough and well-reasoned analyses, and Congressional intent to deter deliberate violations, *see* H.R.Rep. No. 317 (1979); S.Rep. No. 249 (1979). The Commission applied an organized analysis that considered the extent of injury, the good or bad faith of the infringer, the effect on domestic industry, ability to pay the fine, and the public interest.

The intervenor adds that the Commission's approach was conservative, and that a larger penalty was quite supportable in view of the

circumstances, emphasizing that the Consent Order was mostly ignored until these proceedings were initiated.

The penalty of $1.55 million is not without reasoned basis. The Commission followed the guidance of the legislative history of § 337(f)(2) and then applied the six-prong test of *EPROMs*, the Commission stating:

> We note, however, that we have used the [*EPROMs*] factors only as a framework to guide the exercise of our discretion to impose an appropriate penalty amount that takes into account the three overarching considerations enumerated by Congress in the legislative history, *viz.,* the desire to deter violations, the intentional or unintentional nature of any violations, and the public interest. We do not intend, by application of this framework in this case, to foreclose consideration of a modified analytical framework for establishing penalties in future cases.

Commission Opinion Denying Reconsideration at 22. It was not unreasonable for the Commission to employ the *EPROMs* factors, or to reach the conclusion here stated.

### E

We conclude that the penalty of $50,000 for violation days is supported, in view of (1) the Commission's determination that the penalty was a small multiple of the sales value of magnets sold in violation of the Consent Order, (2) the statutory maximum allowable of $100,000 per violation day, and (3) the bad faith of San Huan. The Commission applied a reasoned methodology for arriving at an amount of $1.55 million. No abuse of Commission discretion has been shown.

The Commission's decision is

*AFFIRMED.*